IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 27, 2000

## MICHAEL V. BAILEY v. STATE OF TENNESSEE

**Post-Conviction Appeal from the Criminal Court for Sullivan County**
**No. C41,135     R. Jerry Beck, Judge**

**No. E2000-00432-CCA-R3-PC**
**October 19, 2001**

A Sullivan County jury convicted the petitioner of one count of second degree murder involving the death of his son. For this offense the petitioner received a sentence of twenty years as a Range I, standard offender, and a $50,000 fine.  He unsuccessfully brought a direct appeal challenging both his conviction and sentence. Subsequently, he filed a <u>pro se</u>[1] post-conviction petition and was appointed counsel from the public defender's office. Following an evidentiary hearing, the trial court took this matter under advisement and later issued a detailed order dismissing the petition.  Thereafter, the petitioner requested that his appointed attorney withdraw from the case and that he be allowed to bring his appeal <u>pro se</u>. The trial court granted this motion,[2] and the petitioner now brings this appeal raising three issues.  More specifically, he asserts that (1) the jury instructions, when viewed overall, effectively denied him "a fair trial and a reliable verdict;" (2) the State engaged in misconduct and denied him a fair trial by withholding exculpatory material; and (3) the prosecuting officer made the result of the petitioner's trial unreliable because the officer perjured himself. After reviewing these issues, we find that all have been waived and/or lack merit. We, therefore, affirm the trial court's denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JAMES CURWOOD WITT, JR., JJ., joined.

Michael V. Bailey, Mountain City, Tennessee, Pro Se

---

[1] While the petitioner's direct appeal was pending, the Tennessee Supreme Court ordered his trial counsel to cease practicing law. Subsequently, trial counsel and the petitioner came to be incarcerated in the same prison facility. There trial counsel acted as the petitioner's "legal aide" in the formulation of the petitioner's <u>pro se</u> petition.

[2] The record reveals that prior to granting this request, the trial court had the petitioner returned for a hearing to "fully inform[] [him] of the potential difficulties facing a defendant who seeks to represent himself" and to inquire into his "knowledge, education and experience with the judicial system."

Paul G. Summers, Attorney General & Reporter; Elizabeth B. Marney, Assistant Attorney General; Greeley Wells, District Attorney General; and Joseph Eugene Perrin, Assistant District Attorney, for appellee, State of Tennessee.

**OPINION**

**Factual Background**

In deciding the petitioner's case on direct appeal, this Court summarized the facts as follows:

The defendant, a truck driver, fell from a flatbed trailer and injured his spine. The defendant subsequently underwent disc replacement surgery in 1992. He was prescribed a variety of drugs following surgery including Prozac, an anti-depressant, Orudus, a muscle relaxer and pain reliever, Zantac, a digestive aid, Darvocet, a pain reliever, and Valium, an anti-anxiety drug.

On June 8, 1994, the defendant visited his doctor and refilled his prescriptions. He subsequently went to visit his mother who was ill. While visiting his mother, the defendant took each of the aforementioned drugs. When the defendant arrived home later that afternoon, he took an additional dose of Darvocet, Valium, and Zantac tablets. He also began drinking bourbon whiskey.

Prior to the evening of June 8th, it was evident the defendant and his youngest son, Justin, the victim in this case, did not get along. The victim's step-sister testified the defendant did not like Justin, and the defendant had threatened to "blow his [Justin's] brains out" a few days before Justin was murdered. On other occasions, the defendant had threatened Justin, physically assaulted him, and destroyed Justin's stereo. Jason, the defendant's oldest son, told the jury his father had threatened Justin in the past. The defendant told Justin, "I brought you into this world, I can take you out of this world."

On the evening in question, the defendant recounted to his sons, Jason and Justin, an incident which upset the defendant. The defendant and Justin encountered the defendant's father-in-law in a grocery store. The defendant and his father-in-law argued over fifty dollars the defendant and his wife owed to the father-in-law. Justin walked away from the argument. This angered the defendant because he wanted Justin to stand by his side and protect him because his physical condition would not permit him to defend himself. The defendant expressed anger as he recounted the incident. He asked Jason, his oldest son, if he would have stood by him during the argument.

The defendant subsequently went to Jason's room to listen to music. He eventually displayed a pistol, cocked it, and pointed it at Jason. When Jason told the defendant to remove the pistol from his room, the defendant placed the pistol in his pocket. He told Jason "it's not for you." The defendant then sat in a bean bag chair.

When Justin entered Jason's room, Jason and the defendant were listening to music. The defendant subsequently arose and pulled the pistol from his pocket. He pointed the pistol toward the floor. He then raised the pistol and pointed it at Justin's groin. A few seconds later the defendant pointed the pistol at Justin's head. Justin asked the defendant, "[A]re you going to shoot me, Dad?" Seconds later the defendant shot the victim in the eye. This gunshot wound resulted in the victim's death. The defendant went down a flight of stairs and exited the residence. He walked to a road behind his residence and threw the pistol on the ground.

The defendant testified he and his sons had been playing with the gun. They were "cutting up" and "acting stupid." He did not remember a shot being fired. He only remembered standing in a road behind his residence and hearing his wife scream. His defense at trial was he did not commit a knowing killing because he was under the influences of medication and alcohol.

State v. Michael Bailey, No. 03-C-01-9601-CR-00028, 1997 WL 625278 at, *1-2 (Tenn. Crim. App. at Knoxville, Oct. 10, 1997).

Turning to the proof from the post-conviction hearing, much of the testimony revolved around the taking of a blood sample at the hospital and the results of a blood alcohol content test. According to Dr. Curtis Drumwright, an emergency physician on duty when the petitioner arrived at Bristol Regional Medical Center, the petitioner came to the facility in police custody complaining of abdominal pain. Referring to the medical record of this visit, Drumwright recounted that he had ordered a blood sample taken at the request of the police. He acknowledged that he had not seen the blood drawn but noted that the report reflected a blood alcohol content of .11. He went on to explain that the petitioner had been "somewhat -- under the influence;" thus, a clinical need for this and other tests had also existed.[3] Furthermore, the doctor stated that he had not seen anyone give the blood to a police officer nor had he seen the petitioner sign a consent form prior to the drawing of the blood. In addition, Karen Proffitt, the medical records keeper for the hospital, testified that her office had not directly provided these related records to the Sullivan County Sheriff's Department or to the district attorney's office. Also, Lynn Musselwhite, the custodian of the hospital's business records stated that the hospital had not billed the sheriff's department for the above-referenced ethyl alcohol test. This along with the other services rendered had been billed to the petitioner.

The defense then called the petitioner. While admitting that the jury instructions "could be technically right," the petitioner asserted that they were not sufficiently clear for a lay person to understand. More specifically, he alleged that the instructions emphasized "alcohol's not a defense" to the point that the instruction overshadowed the potential for intoxication to negate a mental element of an offense. Additionally, the petitioner contended that he had signed an "altered . . . DUI consent form" concerning the taking of blood at the hospital. He also averred that Officer Ronnie Bledsoe, who had taken him to the hospital, had carried out a round cardboard container. Based upon his purportedly having worked at a hospital in the past, the petitioner claimed to know that the latter had contained the blood sample, though he provided no further information indicating that this was

_____

[3] On cross-examination, Drumwright added that while he had been able to smell alcohol on the petitioner, he had not experienced any difficulty in communicating with the petitioner.

the case. In fact, the petitioner at first claimed to have heard Bledsoe tell Detective Louie Eleas, the prosecuting officer for the case, about the blood drawn, but later the petitioner admitted that he had not heard anything specifically about the blood sample mentioned.

Lastly, the petitioner called his trial attorney. At the time of the trial, this witness had practiced law for three years and stated that he had tried forty jury trials in Tennessee prior to the petitioner's. He stated that he had prepared three jury instruction requests, but, presumably because of fatigue, he had not followed through on them. When asked by the trial court if there were any special requests, counsel testified that he said, "no." Furthermore, when the trial court provided counsel with the instructions to be given the jury, counsel voiced no objection to them. Nevertheless, at the post-conviction hearing, he stated his opinion that the instruction given was incomprehensible to the jurors. As a result counsel felt that he had provided ineffective assistance in not objecting to the instruction at trial and in failing to raise the issue in the petitioner's new trial motion.

Concerning the test of the first vial of blood taken from the petitioner, counsel testified that he had not seen the test results at the time of trial. According to this witness, the copy he had received of the medical report through discovery had not included the initial page of the report. He added that when he had taken a handwritten release form bearing the petitioner's signature to the hospital in an attempt to get a copy of the record, the hospital had refused to provide it under those circumstances. Nevertheless, he acknowledged that the record had been sent to the trial court pursuant to a subpoena and had become Exhibit 70 presented to the jurors. He also asserted that the State had improperly withheld a modified DUI consent form signed at the hospital. Among other claims, counsel further contended that the State had presented inaccurate testimony regarding whether the petitioner had been "in custody" while at the hospital. Before completing his testimony, this former attorney admitted that he stands convicted of two counts of theft over $60,000; one count of theft over $10,000; one count of theft over $1,000; one count of theft over $500; and forgery. After this witness the petitioner rested his case.

The State then called Nancy Harr and Detective Louie Eleas. Harr had been one of the prosecutors involved in preparing and conducting the petitioner's trial. In this capacity she had engaged in open file discovery with the petitioner's trial counsel[4] and provided him with copies of "all discovery materials." Other than her work product, Harr stated, "[I]f it was in my file [defense counsel] had it." She underscored that she had not seen the petitioner's medical report until the trial court provided her with a copy during trial. In addition, she claimed that she had not thought that there had been another blood test, and she indicated her belief that Detective Eleas had testified truthfully.

Turning to Eleas, the detective asserted that he had not received any blood sample other than the one taken from the petitioner at the jail. He added that he had neither requested nor had he become aware of the hospital sample's existence. Eleas went on to explain that when medical personnel draw a blood sample for law enforcement, certain forms are completed as an aid to establish the chain of custody; however, he noted that he had not heard of this procedure's being needed or done in this case. Furthermore, Eleas provided a different description of the containers used to transport blood from that given by the petitioner. He also indicated that he had never seen

---

[4] The petitioner's trial counsel testified that he did not recall going to the district attorney's office to look at the file but acknowledged that Harr had provided him with "quite lengthy" documents.

a "DUI type release" document allegedly signed by the petitioner. Nevertheless, though he had initially claimed that the petitioner had not been in custody while at the hospital, Eleas ultimately admitted that the petitioner probably would not have been allowed to leave had the petitioner wished to do so.

The trial court heard this and other evidence before subsequently issuing a written order denying the post-conviction petition. In so doing, the trial court made extensive findings of fact.

## Post-Conviction Standard of Review

In analyzing the issues raised, we first note that a petitioner bringing a post-conviction petition bears the burden of proving the allegations asserted in the petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f). Moreover, the trial court's findings of fact "are conclusive on appeal unless the evidence preponderates against the judgment." Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996); see also Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995).

## Post-Conviction Waiver

We further observe that Tennessee Code Annotated Section 40-30-206(g) provides the provisions governing waiver of post-conviction allegations. According to this statute:

> A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless: (1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or (2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

Tenn. Code Ann. § 40-30-206(g)(1),(2).

## Jury Instruction Impropriety

Turning to his first contention, the petitioner alleges that the jury instructions given by the trial court "fail[ed] to adequately and fairly submit the issues and applicable law to the jury" thereby unconstitutionally denying him a fair trial. More particularly, the petitioner claims that the jury instructions taken as a whole bore the same flaw that formed the basis for the reversal in Phipps v. State, 883 S.W.2d 138 (Tenn. Crim. App. 1994), rev'd on other grounds, 959 S.W.2d 538 (Tenn. 1997). The petitioner also raises an ineffective assistance of counsel claim related to this issue.

At the outset we find that the direct challenge to the jury instructions has been waived by the petitioner's failure to raise it on direct appeal. See Tenn. Code Ann. § 40-30-206(g). The petitioner

neither alleges nor proves that either of the exceptions forestalling waiver apply in this situation. Nevertheless, this court has since considered ineffective assistance of counsel claims connected with jury instructions. See, e.g., Fred Edmond Dean v. State, No. E1998-00135-CCA-R3-PC, 2000 WL 337552, at *4-5 (Tenn. Crim. App. at Knoxville, Mar. 21, 2000) applic. granted (Tn 11/13/00). Thus, we address this issue on the merits relative to ineffective assistance of counsel.


### A. Ineffective Assistance of Counsel - Standard of Review

When a petitioner seeks post-conviction relief on the basis of ineffective assistance, the petitioner must prove "that (a) the services rendered by trial counsel were deficient and (b) the deficient performance was prejudicial." Powers v. State, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). To satisfy the deficient performance prong of this test, the petitioner must establish that the service rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Furthermore, to demonstrate the prejudice required, the petitioner "must show that there is a reasonable probability that, but for counsel's" deficient performance, "the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068, 80 L. Ed. 2d 674 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). Indeed, "a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Id.


### B. Failure to Challenge Alleged Jury Instruction Error

As aforementioned, the petitioner acknowledges that the instructions given in his case may have been "technically correct;" however, he claims that when considered as a whole, the charge did not effectively set out the law in a manner understandable by lay jurors. According to the petitioner, the trial court repeated that diminished capacity was not a defense without clarifying that it could be used to negate a mental element of an offense leading to a conviction for a lesser crime. In addition, the petitioner cites a similar deficiency regarding the voluntary intoxication charge.[5]

Without question the accused in a criminal trial has a "right to a correct and complete charge of the law" applicable to the case. Phipps, 883 S.W.2d at 142. At this petitioner's trial, the court charged the jurors that it was their "duty to carefully consider each instruction equally in light of and in harmony with the others." The trial court went on to explain that the jury must find every element of an offense proven beyond a reasonable doubt in order to find the petitioner guilty. Among those

---

[5] In all, the petitioner alleges approximately ten problems related to the instruction. Many of these overlap, and most seem connected with the aforementioned contentions. With regard to the unrelated assertions, we note that the petitioner essentially failed to provide supporting authority for his claims; thus, we find these waived under Rule 10(b) of the Court of Criminal Appeals of Tennessee.

elements listed for second degree murder (the offense of which the petitioner was convicted) was "that the killing was knowing." The trial court defined "knowing" for the jury. Furthermore, the trial court emphasized that "the State must prove beyond a reasonable doubt the required culpable mental state of the defendant before he can be found guilty of any offense embraced in this indictment." Almost immediately thereafter the trial court admonished that the petitioner "can only be found guilty of committing the offenses embraced in this indictment if he acted intentionally or knowing [sic], with respect to each element of the offense . . . . Second degree murder requires that the act be committed intentionally or knowingly." After detailing the mental elements for the lesser included offenses, the trial court stated: "Evidence as to a defendant's diminished mental capacity may be considered by you to show that he was incapable of forming the specific culpable mental state required for any particular criminal offense. It is a question for the jury as to whether such evidence exists and as to what weight it should be given."

The trial court next set out numerous definitions relative to voluntary and involuntary intoxication. First the court explained that intoxication generally is "not a defense to prosecution for an offense" but that involuntary intoxication is a defense "if as a result of the involuntary intoxication, the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of the law allegedly violated." After making it clear that a finding of involuntary intoxication could lead to an acquittal, the trial court charged the jury that "[i]ntoxication, whether voluntary or involuntary, is relevant to the issue of the essential element of the defendant's culpable mental state. " Though the petitioner complains that the trial court did not specifically define "culpable mental state," the court did follow the latter instruction with, "[i]n this case, the State must prove beyond a reasonable doubt the required culpable mental state of the defendant which is if he acted intentionally or knowingly, with respect to each element of the offense" in order to sustain a second degree murder conviction. In addition, the trial court specifically stated: "If you find that the defendant was intoxicated to the extent that he could not have possessed the required culpable mental state, then, he cannot be guilty of the offense charged." Finally, the trial court reiterated: "If you are not satisfied beyond a reasonable doubt that the defendant possessed the culpable mental state, then you must find him not guilty."

Contrary to the petitioner's view, we find that the above-outlined instruction fairly and adequately apprized the jury of the law in an understandable manner. The situation presented here is distinguishable from State v. Phipps and from State v. Hall, 958 S.W.2d 679 (Tenn. 1997)–cases cited by the petitioner. In Phipps, the trial court particularly instructed the jury:

> The defendant contends that he was suffering from mental conditions known as post traumatic stress disorder [PTSD], and major depression at the time of the commission of the criminal offense giving rise to this case. I charge you that post traumatic stress disorder and major depression are not defenses to a criminal charge. Insanity may be a defense, however, the defendant makes no claim that he was insane at the time of the killing giving rise to this case.

Phipps, 883 S.W.2d at 142. The opinion makes no reference to instructions potentially tying PTSD and the major depression to Phipps' culpable mental state; however, in the instant case the link between the petitioner's alleged diminished capacity and/or intoxication and the culpable mental

state was articulated in the trial court's instructions. Turning to Hall, we find it even less applicable because therein the supreme court did not wrestle with this type of jury instruction issue, but rather with the admissibility of expert testimony. Hall, 958 S.W.2d at 688-92. Thus, though diminished capacity is discussed in connection with the trial court's refusal to admit particular testimony, Hall is inapplicable in this case.

Based upon these findings and the record presented, we conclude that counsel did not provide deficient performance in failing to raise this issue previously. As such, the petitioner's ineffective assistance of counsel claim lacks merit.


## Alleged Brady Violations

The petitioner next contends that the State withheld from him exculpatory evidence consisting of the first page of a medical report, a modified DUI consent form, and blood drawn at the hospital on the night of the murder. Nevertheless, again the petitioner failed to raise these matters on direct appeal and does not prove that either of the exceptions forestalling waiver apply in this situation. See Tenn. Code Ann. § 40-30-206(g).[6] We therefore conclude that he has waived these contentions.

Furthermore, we observe that even if the petitioner had not waived these concerns, he failed to provide the requisite clear and convincing evidence supporting them. See Tenn. Code Ann. § 40-30-210(f). In Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Additionally, the Tennessee Supreme Court has noted that to establish a due process violation under Brady, all four of the following prerequisites must be met:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
> 2. The State must have suppressed the information;
> 3. The information must have been favorable to the accused; and
> 4. The information must have been material.

Irick v. State, 973 S.W.2d 643, 657 (Tenn. Crim. App. 1998).

---

[6]In his amended petition filed December 10, 1999, the petitioner did raise an ineffective assistance claim related to trial counsel's failure to secure a copy of the medical report's first page; however, he does not present any argument in his brief to this Court concerning this claim. He has, thus, waived the matter pursuant to Rule 10(b) of the Court of Criminal Appeals of Tennessee.

Looking to the second prerequisite alone,[7] we find insufficient proof establishing that the State ever had any of these items in its possession or that the State attempted to prevent the petitioner from acquiring them. Concerning the medical report, the petitioner was aware that he had been to the hospital; he had informed his attorney of that fact; the report was the petitioner's own; the full report was submitted to the jury at trial after defense counsel had subpoenaed the record to court; the hospital's medical records keeper testified that the report had been provided to the public defender; this witness further stated that she saw no indication that the State had requested or been provided these documents; and former Assistant District Attorney Harr related that she had first encountered the records at trial. With respect to the alleged modified DUI consent form, the only proof offered to support its existence was the petitioner's testimony. Finally, regarding the blood sample itself, proof was presented showing that a sample had been ordered and that the hospital had tested it; however, there was no proof that this sample had at any point come under the State's control. Faced with these facts and for the aforementioned reasons, we conclude that this issue does not entitle the petitioner to relief.

### Perjured Statements

Lastly, the petitioner contends that Detective Louie Eleas lied under oath during the trial. While a portion of his accusation is unclear, the petitioner seems to contend that Eleas testified falsely about receiving the objects discussed in the previous issue. The petitioner also avers that the detective lied about when the petitioner came into custody.

Once more, we find that the petitioner has waived both of these matters by failing to previously raise them or provide the court with proof of one of the exceptions to the post-conviction waiver provisions. See Tenn. Code Ann § 40-30-206(g). Additionally, regarding the blood test items, a review of the analysis in the previous issue reveals that the petitioner has failed to provide clear and convincing evidence that these items were ever in the State's possession before trial, much less that Eleas perjured himself concerning the items. Finally, although Eleas' trial testimony reveals that he stated petitioner was not in custody during the hospital visit, and Eleas' post-conviction testimony reveals that petitioner was in custody, the discrepancy appears to result from Eleas' misunderstanding concerning when an individual is legally "in custody," rather than from perjury. Thus, even if this issue were not waived, it lacks merit. See Tenn. Code Ann. § 40-30-210(f). The petitioner is not entitled to relief on this issue as well.

### Conclusion

---

[7] Though this analysis focuses on the second factor, we believe that others may also very well be relevant to precluding relief in this situation.

For the foregoing reasons, we find that all of the petitioner's allegations are waived and/or do not merit relief. Accordingly, the judgment of the trial court is AFFIRMED.

_____
JERRY L. SMITH, JUDGE